# Albert Fuchs, Appellant, v. Par Kar Amusement Company, Appellee.

## Gen. No. 29,220.

1. **LANDLORD AND TENANT**—*effect of improper use of premises not included in lease as working forfeiture.* A lease of "the certain storeroom, situate on the third floor of building" did not include a pent house above that floor though the lessee was orally given permission to use it as a storeroom, and use by him of such pent house for a different purpose did not entitle the lessor to forfeit the lease of the third floor.

2. **FORCIBLE ENTRY AND DETAINER**—*when exclusion of evidence proper.* In an action of forcible entry and detainer the exclusion when offered by plaintiff of a bill and answer in a suit in equity between the parties was correct, where neither contained anything counter to the position taken by defendant in the detainer suit.

Appeal by plaintiff from the Municipal Court of Chicago; the Hon. WILLIAM R. FETZER, Judge, presiding. Heard in the third division of this court for the first district at the March term, 1924. Affirmed. Opinion filed April 29, 1925.

BROWN, ALSCHULER & REAGH, for appellant.

A. H. BROWN, for appellee.

MR. JUSTICE TAYLOR delivered the opinion of the court.

This is an appeal from a judgment in the municipal court of Chicago in an action of forcible entry and detainer brought by Albert Fuchs against the defendant Par Kar Amusement Company to recover possession of "The bowling alley on the third floor at 3801-3803 Broadway, Chicago, Illinois." The cause was tried without a jury, and the court found the defendant not guilty of unlawfully withholding from the plaintiff "the possession of the premises described in plaintiff's complaint."

On November 1, 1918, the plaintiff, Albert Fuchs, in writing leased to the defendant: "the certain Store Room, situate on the third floor of building

known and designated as No. Chateau Theatre Bldg., 3800-10 Broadway Street in the City of Chicago in the State of Illinois, to be used solely for the storage and sale of bowling and billiards and for no other purpose, from November 15, 1918 to August 30, 1928.'' The rent was to be $300 per month for the first eighteen months, $450 per month for the next twelve months, and $500 per month thereafter. The third clause of the lease provided against assignment without the written consent of the lessor; the fourth clause, that the lessee would not allow the premises to be used in such a way as to increase the insurance rate, nor to be occupied, in whole or in part, by any other person; the twelfth clause, that no changes or alterations should be made without the written consent of the lessor.

Although at the trial the plaintiff contended that the defendant had violated the terms of the lease in a number of ways, such as allowing part of the premises to be occupied by others, and changing the fire wall so as to increase the insurance rate on the building, it is conceded here that as the trial judge decided those matters, on the evidence which was conflicting, against the plaintiff, there is, in reality, but one question here, and that is, whether a certain part of the building called the pent house was included in the premises which were leased to the defendant.

The Chateau Theatre Building, the third floor of which the plaintiff leased to the defendant, is situated at the northwest corner of Broadway and Grace streets, Broadway being a north and south, and Grace an east and west street. The first floor of the building is occupied with stores and restaurants; the second floor with lodge halls and offices, and the third floor is entirely given up to the bowling alley and billiard rooms of the defendant, and constituted the premises that were covered by the lease. There is a wide stone staircase leading from Broadway, and

also from Grace street, to the second and third floors of the building. The bowling alley occupies the corner on the third floor, being 110 feet on Broadway, and 110 feet on Grace street. North of the bowling alley, 30 x 100 feet, is the billiard room, running east and west. A space some 6 or 8 feet from the east end of the billiard room is cut off by a partition, making a room called the rest room, which is approximately 8 feet by 40 feet, and has windows opening on Broadway. The door between the rest room and the billiard room is kept locked. At the north end of the rest room is a large staircase leading up to the so-called pent house. That is the only inclosed space in the building that is above the floor rented by the lessee. There is a stairway leading to the pent house, containing about twenty-five steps. The room is about 20 x 25 feet. The floor of the pent house is flush with the ceiling of the billiard room. There is a solid roof over the pent house, and it contains two small windows, one on the east and one on the south side. From floor to ceiling it is from 8 to 9 feet. The sides of the pent house jut out above the roof from 6 to 8 feet. The pent house can be reached only by going through some part of the third floor. Certain changes were made after the defendant entered into possession of the premises, whereby a partition was built along the north line of the bowling alley, making a space about 2½ feet wide, by means of which one could pass from the head of the staircase, after entering the demised premises from Broadway, along, parallel to the bowling alleys, into the rest room, and from there up to the pent house.

The architect testified that the pent house was designed for a storeroom. The evidence of the plaintiff is to the effect that before he made the lease he went through the entire premises with Parsill, the president of the defendant company; that before they went into the pent house Parsill said to the plaintiff,

"Why, you have not got any storeroom for pins.
I have a hundred boxes of pins for the different teams
that bowl here, they got their own pins, I haven't
got any place to put them"; that he, the plaintiff,
then said, "Come on, I will show you the finest place
that you have ever seen that belongs to you"; that
he took Parsill up there, and the latter said, "That
is dandy"; that the plaintiff then said, "Nobody can go
in there, all the windows are heavily guarded with
iron and there is nobody able to get into this room
except from your billiard room."

On the theory that the pent house was part of the
demised premises, the plaintiff introduced evidence
at the trial that the defendant had used that space in
a way which was in violation of the defendant's rights
under the lease; that although the property was leased
solely for bowling and billiards, and for no other
purpose, the defendant had permitted pin boys to
sleep in the pent house, sometimes four, and some-
times six, and that that was a breach of the plain-
tiff's rights. As we view the case, we think that
question, however, becomes immaterial. In our opin-
ion, the pent house was not part of the demised prem-
ises.

Whether the pent house was part of the premises
leased was a question which involved an interpretation
of the written lease, in conjunction with whatever evi-
dence there was, if any, that was competent in neces-
sary explanation of the space the words of the lease
covered, according to the understanding and meeting
of minds when the lease was made. Of course, the
mutual conduct of the parties after the lessee took
possession might be considered pertinent, also, as evi-
dence. *Patterson v. Graham*, 140 Ill. 531.

In *Lynch v. Baldwin*, 69 Ill. 210, where a lessor
leased a house, and, outside of the lease, orally agreed
that the lessee should have the use of the well and out-
house on another lot, but, as the result of the con-

duct of the lessor, the lessee was prevented from using them, and the lessor had caused to be issued a distress warrant against the lessee for the nonpayment of rent, the court said: "The deprivation of the tenant of the use of the well and water-closet was not an eviction, nor could it be, inasmuch as their use was not embraced in the lease. All of his rights to their use grew, as we understand it, out of a verbal agreement."

In *Patterson v. Graham,* 40 Ill. App. 400, the court said: "The terms of the written lease could not be varied by parol evidence of what the agent of the lessor said as to the lease including the right to the buildings in the rear."

In *Hosher v. Hestermann,* 58 Ill. App. 265, the court held that a lease of No. 161 South Desplaines street (which was a corner saloon) did not include a building on the same lot, facing a side street, and which had been used as a blacksmith shop, even though the lessee had taken possession of it and occupied it for four months under an oral permission given subsequent to the lease.

The contention of the plaintiff here is that the pent house became part of the premises demised by the written lease, and that the tenancy thereof by the defendant bound him to the written obligations of the lease itself, even as regards the space included in the pent house, and if, therefore, the defendant allowed the pent house to be used by pin boys as sleeping quarters, it constituted a violation of the terms of the lease and justified the plaintiff in bringing suit.

We do not feel, however, that the evidence justifies the conclusion that the premises demised by the written lease included the pent house. The words of the written lease need no explanation; they are not ambiguous. The expression, "the certain store room situate on the third floor of building" cannot, by any

reasonable interpretation, be made to include the pent house which was on another floor and entirely apart from the space designated in the lease itself.

A case which goes further than it is necessary to go in the instant case is that of *Cluett v. Sheppard*, 131 Ill. 636. In that case the owner leased the loft of a building for a certain period of time at a certain rental, and in the lease following the description of the premises there were provisions as to the term, rental, etc.—there was a memorandum as follows: "Tenant to have privilege of storing a reasonable number of cases in the basement." The lessor sued for unpaid rent. The lessee defended on the ground that he had been evicted of a material part of the premises and had paid all the rent due up to the time he left. The evidence showed that the lessee had never had possession of the basement, but that, in compliance with that part of the lease, the lessee was furnished with space on the fourth and fifth floors of the same building, and that after using that space for about a year, the landlord took that space from him and would not permit him to use the space in the basement. It also showed that the landlord offered the lessee space on the fourth floor, but that it was refused, on the ground that it was insufficient. In determining the effect of the memorandum containing the words, "Tenant to have privilege of storing a reasonable number of cases in the basement," the court said: "We are also of the opinion that the clause referred to did not amount to a leasing of premises. No part of the basement is described. No amount of space is mentioned. What might be regarded as a reasonable number of cases is left fully to conjecture. There is nothing to indicate the kind of cases referred to, and therefore it is impossible to determine whether much or little space would be required for their storage. At most, it can only be considered as granting the privilege to the lessee to

Fuchs v. Par Kar Amusement Co., 236 Ill. App. 487.

occupy, for the special purpose, space not included in the lease." And, so, it must be said here in the instant case, that the defendant was orally granted the privilege to occupy the pent house for a special purpose and that that space was not included in the lease. The pent house, therefore, not being included in the lease, the plaintiff was not entitled to forfeit the lease for anything that the lessee may have done in the use of the pent house.

It is claimed that a bill of complaint, by the plaintiff here, and an answer by the defendant, in a suit in equity in the circuit court, which were offered in evidence and ruled out, were admissible. An examination of them, however, shows that in neither the bill nor the answer was there anything counter to the position taken by the defendant at the trial of this case, and, so, the ruling of the trial judge was correct. As to the memorandum that was ruled out, it had no bearing whatever on any of the issues that were tried.

The judgment, therefore, will be affirmed.

*Affirmed.*

O'CONNOR, P. J., and THOMSON, J., concur.